# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK
## WHITE PLAINS DIVISION

MARTIN GELBSPAN, AARON HINDS and ALEXANDER GOVEA, on behalf of themselves and all others similarly situated,

         *Plaintiffs*,

  v.

PEPSICO INC. and WALMART INC.,

         *Defendants*.

Case No. _____

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

## CLASS ACTION COMPLAINT

Plaintiffs MARTIN GELBSPAN, AARON HINDS and ALEXANDER GOVEA ("Plaintiffs"), on behalf of themselves and all others similarly situated, allege the following Class Action Complaint against the above-captioned Defendants, PEPSICO INC. ("Pepsi") and WALMART, INC. ("Walmart") (Pepsi and Walmart are referred to herein collectively as "Defendants") upon personal knowledge as to themselves and their own actions, and upon information and belief, including the investigation of their counsel, as follows:

## I.    NATURE OF THE ACTION

1.    As a result of a vertical price-fixing scheme, Pepsi and Walmart have artificially raised the price of Pepsi across the United States at every single retailer other than Walmart for over a decade.[1]  In order to financially reward themselves to the detriment of consumers and benefit from suppressed competition, the Defendants weaponize from the dominant market share that Pepsi has in the soft drinks market as well as utilize the power of the dominant market share that Walmart has in the grocery store market to cause Walmart's competitors to pay supracompetitive prices at wholesale while also throttling price competition for consumers at retail.

2.    This is the type of the conduct that the antitrust laws are intended to prevent and protect against: using *Standard Oil*-like tactics to drive competitors from the market in place where Pepsi has robust competition while dominating key channels of commerce and distribution, like Walmart.  Indeed, in 1914, when the United States Congress passed the Clayton Act, it was explained in the House Report that the goal was to restrain this very behavior: large corporations

---

[1] Currently, Walmart sells 249 Pepsi soft drink products, and it also sells 37 soft drink products of its in-house generic brand, "Great Value."  These soft drink products compete horizontally with each other in stores at Walmart, and Pepsi's products are sold domestically at hundreds of different retail chains while Great Value is sold on major platforms, including Amazon.

which would depress their own prices "to destroy and make unprofitable the business of their competitors" in an attempt to "acquire a monopoly in the particular locality or section in which the discriminating price is made." *See, e.g.,* Lina Khan, "*Amazon's Antitrust Paradox*," 126 YALE L. J. 710 (Jan. 31, 2017), at 723.

3.    With this at the forefront, as well as Walmart's recidivist behavior akin to this very same type of conduct,[2] Pepsi and Walmart created a price fixing scheme which consists of an agreement between Pepsi and Walmart to give Walmart preferential pricing. Ultimately, this scheme provides a "price gap" where Pepsi would sell its soft drink products to Walmart at prices below any other competitor of Walmart's which also sells Pepsi soft drink products. Put differently, Pepsi inflates the sale price of its soft drink products at every single retailer other than its largest customer, Walmart – which means that both the retailers and stores who purchase Pepsi products as well as the downstream consumers, like Plaintiffs and Class members, paid higher-than-competitive prices for Pepsi products from every seller other than Walmart. Additionally, Pepsi provides promotional payments, allowances, and services to Walmart to advantage its largest account which it does not offer or denies to other retailers which compete with Walmart to sell Pepsi's soft drink products. As Amazon Paradox states, referencing *Standard Oil*, "price cutting [is] perhaps the most effective weapon of the larger corporation." *Khan,* at 723.

4.    Regarding these allegations, Stacy Mitchell, the co-director of the Institute for Local Self-Reliance, stated "[f]or years, PepsiCo has been systematically weaponizing its relationship with Walmart to crush competition."

---

[2] *See, Copeland et al. v. Energizer Holdings, Inc., et al.*, Case No. 5:23-cv-02087-PCP (N.D. Cal. 2023) (motion to dismiss denied alleging the same or similar allegations against Walmart and Energizer regarding the sale of store-bought batteries).

5.      According to Pepsi's internal documents, the commitment to this price fixing scheme is a "foundational commitment" which "deliver[s] on Walmart['s] hedge commitments" as an essential strategy;  and, as one Pepsi email disclosed by the Federal Trade Commission ("FTC") in *Federal Trade Commission v. PepsiCo, Inc.* states: "stay[ing] focused on our price gap … is how we win with Walmart – [w]e stay focused on our deliverables and commitments."  *See, e.g.*, Case No. 1:25-cv-00664-JMF, at ECF No. 68 (S.D.N.Y. Dec. 11, 2025).

6.      According to the FTC, "Pepsi relies on several potential levers" including: (1) providing Walmart with promotional payments and allowances to reduce the prices that Walmart pays for Pepsi soft drink products, (2) reducing promotional payments and allowances to Walmart's competitors to "nudge their retail prices for Pepsi's soft drink products above Walmart's," and (3) charge higher prices at wholesale to Walmart's competitors.  *Id.*  Pepsi also receives significant advertising advantages within stores, including being highlighted over other soft drinks and receiving preferential displays.  *Id.*

7.      To make sure that Pepsi continues to give Walmart preferential pricing over its competitors, the FTC notes that Pepsi "provides data and other services" to Walmart about competitor pricing – which, in turn, allows Pepsi to consistently check its price gap for Walmart is better than those of Walmart's competitors.  *Id.*  Pepsi also reduces and eliminates promotional support or increases wholesale prices even further for Walmart's competitors when they threaten Walmart's prices at retail which are paid by consumers, like Plaintiffs and Class members.  In internal emails amongst Pepsi's executives, Pepsi describes an increase in prices across its customer list other than Walmart to punish other retailers which compete against Walmart: "[REDACTED COST INCREASE AMOUNT] cost increase in rest of the market.  The cost increase, which is already in effect in rest of market, has not been passed on to Walmart."  *Id.*

8.      As the FTC states, and is the core of this action, Pepsi's conduct has the effect of raising prices, harming consumers who shop at retailers other than Walmart.  *Id.*  As such, Plaintiffs, on behalf of themselves and all others similarly situated who bought Pepsi soft drink products in the Relevant Market from January 1, 2015 through the present ("Class Period"), brings this Action against Defendants under Section 1 of the Sherman Antitrust Act, state antitrust laws and the common law doctrine of unjust enrichment to recover actual damages, treble damages, statutory damages, disgorgement of profit, injunctive relief, reasonable costs and attorneys' fees, and pre- and post-judgment interest.

## II.      JURISDICTION AND VENUE

9.      This action arises under Section 1 of the Sherman Act (15 U.S.C. § 1) and Section 16 of the Clayton Act (15 U.S.C. § 26).  Plaintiffs' Sherman Act claim seeks damages (including actual and treble damages), injunctive relief, costs of suit, pre- and post-judgment interest and reasonable attorneys' fees, and Plaintiffs' state law claims seek damages (including actual and treble damages), injunctive relief, costs of suit, pre- and post-judgment interest and reasonable attorneys' fees.

10.      ***Subject Matter and Supplemental Jurisdiction***.  Plaintiffs bring this Action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to remedy violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, as well as under the state antitrust laws and the doctrine of unjust enrichment, such that subject matter jurisdiction is proper under 28 U.S.C. §§ 1331, 1332(d), 1337(a) and 1367.  This Court has federal question jurisdiction under 28 U.S.C. §§ 1331 and 1337 because Plaintiffs assert claims arising under the federal antitrust laws, as Plaintiffs bring this Action to remedy violations of Section 1 of the Sherman Act.  This Court has supplemental jurisdiction over Plaintiffs' state and common law claims under 28 U.S.C. § 1367 because all of

their claims arise from the same facts and circumstances and form part of the same case or controversy.

11.    Additionally, this Court also has subject matter jurisdiction over Plaintiffs' state law claims under the Class Action Fairness Act of 2005 ("CAFA").  *See*, 28 U.S.C. § 1332(d). This Court has subject matter jurisdiction under CAFA because the amount in controversy exceeds the sum of $5,000,000 (exclusive of costs and interest), there are more than 100 putative members of the Class and minimal diversity exists between the litigants, as one or more of the Class members is a different citizen than Defendant.  Namely, during the statutory period, Plaintiffs were or are domiciled in California, Florida, Massachusetts, New York, and New Jersey, and Virginia whereas Defendant Walmart is headquartered in Arkansas.

12.    ***Personal Jurisdiction.***  This Court has personal jurisdiction over the litigants under Section 12 of the Clayton Act (15 U.S.C. § 22 and 28 U.S.C. § 1391) because Defendant Pepsi maintains its headquarters here, in this District, Defendant regularly transacts business in this District, and a substantial portion of the activity at issue in this case occurred in this District.  This Court also has personal jurisdiction pursuant to Federal Rule of Civil Procedure 4(k)(2) and 15 U.S.C. § 22, which permit bringing an antitrust lawsuit against any corporation in any district where that corporation may be found or transacts business as well as allows process in such cases to be served in any district where that corporation may be found.

13.    ***Venue.***  Venue is proper in this District under Sections 4, 12 and 15 of the Clayton Act (15 U.S.C. §§ 15, 22 and 16 and 28 U.S.C. §1391(b), (c) and (d), because Defendant PepsiCo Inc. maintains its headquarters in this District, Defendants reside in or transacts business in this District (or are licensed to do business in this District) and a substantial portion of the interstate commerce described herein was carried out in this District.

14.    **_Interstate Commerce._**  Defendants' unlawful, anticompetitive conduct as alleged herein substantially impacts interstate trade and commerce by harming competition and consumers alike by raising prices, restricting output and throttling innovation throughout the United States, causing injury to Plaintiffs and the geographically dispersed members of the Class.

## III.    PARTIES

### _Plaintiff Martin Gelbspan_

15.    Plaintiff Martin Gelbspan was a California resident at all times relevant to this action.

16.    During the Class Period, and while residing in the State of California, Plaintiff Gelbspan purchased Pepsi soft drink products from a retailer other than Walmart for his own use and not for resale.  Plaintiff Gelbspan suffered injury in the form of overpayment for Pepsi soft drink products as a result of the conduct as alleged herein.

### _Plaintiff Aaron Hinds_

17.    Plaintiff Aaron Hinds was a Florida, Massachusetts and New York resident before moving to the State of New Jersey at all times relevant to this action.

18.    During the Class Period, and while residing in Florida, Massachusetts, New York, and New Jersey, Plaintiff Hinds purchased Pepsi soft drink products from a retailer other than Walmart for his own use and not for resale.  Plaintiff Hinds suffered injury in the form of overpayment for Pepsi soft drink products as a result of the conduct as alleged herein.

### _Plaintiff Alexander Govea_

19.    Plaintiff Alexander Govea was a California and New York resident before moving to the Commonwealth of Virginia at all times relevant to this Action.

20.     During the Class Period, and while residing in California, New York and Virginia, Plaintiff Govea purchased Pepsi soft drink products from a retailer other than Walmart for his own use and not for resale.  Plaintiff suffered injury in the form of overpayment for Pepsi soft drink products as a result of the conduct as alleged herein.

**_Defendant PepsiCo, Inc._**

21.     Defendant PepsiCo., Inc, a leading manufacturer of soda, maintains its principal place of business in the State of New York.

**_Defendant Walmart Inc._**

22.     Defendant Walmart Inc., which operates thousands of retail stores in the United States and sells soda which competes directly with the soda sold by PepsiCo, maintains its principal place of business in the State of Arkansas.

## IV.    FACTUAL ALLEGATIONS

### _The Relevant Market_

23.     Insofar as Plaintiffs are required to plead the relevant product and geographic markets to establish antitrust standing for the violations alleged herein, Plaintiffs allege the relevant markets at issue and have pleaded how Defendants' conduct harmed competitive processes in these markets.

24.     **_Relevant Product Market_**.  The Relevant Product Market is the market for soft drink products.  The Relevant Market (soft drink products sold within the United States) consists of two types of non-alcoholic beverages which comprise a $150 billion industry in the United States: (1) carbonated soft drinks ("CSDs") and (2) non-carbonated soft drinks ("NCSDs").

25.     CSDs include traditional carbonated sodas whereas NCSDs consist of other non-alcoholic beverages which are not carbonated, including energy drinks, juice, sports drinks,

dairy/dairy substitute drinks, tea, coffee, and bottled still water.  These products are sold in every corner store and retailer across the United States – in part because of their popularity amongst Americans but also because of their tendency to be both widely available and affordable.

26.    Soft drink products cannot be reasonably replaced or substituted with a similar product.  Because there are no substitutes for soft drinks, the demand for soft drink products is relatively inelastic – that is, consumers do not refrain from buying soft drink products when prices rise (even substantially).

27.    ***Market Power***.  The Relevant Market is highly concentrated.  Upon information and belief, the top three soft drink producers represent as much as 90% of the entire Relevant Market.  Pepsi is one of those three firms.

28.    ***Hypothetical Monopoly Test***.  The Relevant Market satisfies the test for market definition used by the federal antitrust enforcement agencies known as the "SSNIP test."  The test asks whether a hypothetical monopolist in a proffered market could profitably impose a small but significant (typically 5%) non-transitory increase in price (a "SSNIP"), without causing a significant number of customers to switch to other products or services such that the SSNIP would be unprofitable to the monopolist.  If the SSNIP is profitable, the market is properly defined.  If not, the market is too narrowly defined, and it does not encompass sufficient economic substitutes.

29.    Here, the SSNIP test is satisfied, and the market is properly defined.

30.    As described both above and below, the Pepsi and Walmart have been able to increase the price of soft drink products (including Pepsi soft drink products) exponentially over the Class Period.

31.    Yet, despite these unnatural price increases, Pepsi and Walmart have not lost market share.  The reason for this is simple: Pepsi and Walmart collectively make more money when they neutralize price competition and coordinate pricing.

***Defendants' Businesses***

32.    Hundreds of millions of Americans drink soft drink products on a daily basis – and this is even more true in times of economic downturns because of the caloric value that soft drink products provide as compared to more expensive drink options (*e.g.* juice and fine coffee beverages) as well as food itself.

33.    These are key reasons why soft drink prices have continued to climb in the United States: because of their inelasticity and their durability as consumable products.



34.     As a result, soft drink products are a very important line of business for any and every retailer – and the manufacturers and marketers of soft drink products make significant income for these products which cannot otherwise be easily replaced.

35.     ***Pepsi's Business.***  Pepsi is the second largest manufacturer and marketer of soft drinks across the United States – with annual sales through their PepsiCo Beverages North America division exceeding $27.6 billion in revenue in 2023 alone.  These soft drink products are distributed to Pepsi's retailers through bottler networks, which are wholly owned subsidiaries of Pepsi that sell Pepsi's soft drink products directly at wholesale prices to Pepsi' retail customers – including grocery stores, drug stores, convenience stores, discount/dollar stores, mass merchandisers, membership stores, and others.

36.     Pepsi's soft drink products are purchased from Pepsi's bottlers and then are sold to consumers at retail – either through online channels or at brick-and-mortar stores.  These retailers compete amongst each other as well as with Pepsi: nearly every major retailer, including Walmart, has its own line of soft drink products which are sold horizontally in competition to Pepsi's own soft drink products.

37.     ***Walmart's Business.***  At the retail level for groceries, there is a single dominant firm: Walmart.   Currently, Walmart has over 4,600 stores across the United States which all sell Pepsi soft drink products, as well as hundreds of Walmart's "Sam's Club" locations.  Pepsi soft drik products are also sold by Walmart on its website, Walmart.com, as well as Walmart's mobile application.

38.     To date, Walmart is the only retailer Pepsi references in Pepsi's annual SEC filings. stating that it would have a "material adverse effect" if Pepsi lost its biggest customer, Walmart. Walmart currently sells Pepsi's soft drink products in competition with small and independent

retailers, as well as Meijer, Albertsons', Hy-Vee, Stop & Shop, Kroger, King Sooper, Publix, Food Lion, Fred Meyer, Raley's, H-E-B, Food 4 Less, Smith's, Jewel, Price Chopper, Giant Eagle, Bashas, Big Y, Fiesta, Brookshire, Supervalu, Wegmans, Weis, Tops, Target, B.J.'s, Rite Aid, CVS, Walgreens, Family Dollar, Dollar General, Dollar Tree, and others.  The Pepsi soft drink products which Walmart sells include the following brands (which are also sold by the above listed retailers): Pepsi, Diet Pepsi, Mountain Dew, Starry, Bubly, Aquafina, Lipton, Pure Leaf, Gatorade, Rockstar, and (bottled) Starbucks soft drink beverages.

### *Defendants Agree to the Conspiracy*

39.    As late as 2015, Pepsi made a "foundational commitment" to make sure that Walmart would have a significant price advantage which it called either a "price gap" or a "hedge" that would allow Walmart to purchase and sell Pepsi soft drink products at prices consummately more favorable than its competitors.  Because of Walmart's substantial retail market share as a seller of groceries (and, therefore, products like soft drinks), Pepsi needed to ensure that Walmart would continue to be its largest customer – which hatched the conspiracy as alleged herein.

40.    As the FTC states, and according to Pepsi's Senior Director of Revenue Growth Management in 2021 writing to other Pepsi executives: "[d]elivering on [the] Walmart hedge commitments is an aligned commercial strategy."

41.    Pepsi's retail price gap consists of monitoring Walmart's retail prices to compare them to other competitors (so that Pepsi can assess competitors seeking to undercut Walmart's advantage) in order to then: (1) provide Walmart with promotional payments and allowances as discounts to reduce Walmart's retail prices for Pepsi soft drinks, (2) reducing Walmart's competitors' discounts to increase Walmart's competitors' retail prices for Pepsi soft drink products above Walmart's, and (3) directly raising wholesale prices offered by bottlers to non-

11

Walmart retailers in order to make it impossible to beat Walmart's retail prices on Pepsi soft drink products sold directly to consumers.

42.     The price gap is a vital measurement that Walmart regularly discusses with Pepsi. As the FTC states, one Pepsi executive noted in an email that "if the monthly or quarterly retail prices gaps are 'out of balance' then Walmart 'will pressure [Pepsi] for actions." According to the FTC, Pepsi's metrics related to the tracking statistics have two key targets: (1) **the price gap**, which is the "[c]omparison of average price for Walmart [versus] comparisons within a time frame weighted on Walmart volume for items" and (2) **the value hedge**, which is the percentage price difference between Walmart's Pepsi soft drink product prices as compared to other retailers.

43.     Pepsi also deliberately targets retailers who, on their own, undercut Walmart's pricing for Pepsi soft drink products – Pepsi refers to these retailers as "offenders." Together, Pepsi and Walmart ensure that the "leakage" in price advantage and market share are swiftly redressed by taking corrective action against those retailers (including raising their wholesale prices and removing discounts) while also allowing Walmart to receive advantages which close the gap (including lowering wholesale prices and offering better discounts).

44.     One such offender as Food Lion. According to the FTC, in 2022, Pepsi believed that Food Lion had attempted to undercut Walmart's prices "relative to its [other] competitors." Pepsi called Food Lion the "worst offender" and correspondingly cut Food Lion's access to discounted pricing as well as raising the wholesale prices of Pepsi soft drink products to Food Lion's disadvantage.

45.     All of this can and does occur because Pepsi gives Walmart access to its pricing data as provided to Walmart's competitors – information which Pepsi should not give to Walmart (especially because Walmart is also a horizontal competitor through its Great Value products) and

which Walmart should not have because it directly competes with other retailers who sell Pepsi products.  An example of this is cited by the FTC: in October of 2020, a senior buyer for Walmart complained via email to Pepsi's Senior Director of Sales that Pepsi "continue[d] to undermine [Walmart's] price leadership with our competition" referencing a Target promotion which contained significant discounts on a Pepsi soft drink product.  Pepsi's Senior Director of Sales replied, "we understand the importance of finishing strong and that price leadership is key.  With that context, the data we have indicates that [Walmart's] price leadership with [that specific Pepsi product] is advantaged versus the market and prior year … [Walmart] has an advantaged price gap on [that product] [against] [the rest of the market] [including] Target."

46.     This conspiracy benefits both Pepsi and Walmart.

47.     To keep expanding their collective market position, Walmart heavily advertises its low prices on Pepsi soft drink products; and, as a 2018 Pepsi document states (which is cited by the FTC): Walmart's wholesale "cost and margin improve your [retail price gap versus [the] rest of [the] market.  This [drives] an advantaged position for Walmart in exchange for an advantaged position on [Walmart's retail signage] to position both Walmart and PepsiCo for growth."

48.     Beyond increased sales, the financial benefits to both Defendants are clear.

49.     *First*, Pepsi agreed to inflate its wholesale prices to Walmart's competitors.  That enabled Pepsi to enjoy inflated prices paid by those competitors.  It also enables Walmart to benefit from market share for the sale of Pepsi soft drink products which it would not have sans the illegal agreement.

50.     *Second*, Pepsi also agreed to prevent its direct purchasers from undercutting Walmart's retail prices.  The goal is and was to give Pepsi the ability to further inflated its prices to retailers that chose to compete on price, ultimately driving them out of the market ¡f they did

13

not comply while also enabling Walmart to artificially inflate its prices by an additional increment if it chose to do so.

51.    The greatest potential threat to the conspiracy was other soft drink providers other than Pepsi. Pepsi's competitors could have attempted to gain market share from Pepsi through pricing. But Walmart deprived others of the single largest opportunity to compete: Walmart stores. Walmart gave and gives Pepsi advantages which other brands do not have: key positions in the store as well as placement which allows Pepsi to be the flagship soft drink product brand in Walmart's stores. That benefits Walmart. It also protected Pepsi from its greatest competitive threats.

52.    In this way, the conspiracy facilitated inflates pricing, entrenches Pepsi's market share both in Walmart stores and across the entirety of the Relevant Market.

### *Antitrust Injury and Anticompetitive Effects*

53.    While the conspiracy caused antitrust injury to both companies' direct competitors, the largest harm caused is the harm to consumers who purchase Pepsi soft drink products as affected by this conspiracy. This is because, indirect purchasers, like Plaintiffs and Class members, cannot pass off the overcharges they incur from the purchases made in the Relevant Market. In contrast, direct purchasers, like retail stores (*i.e.*, Target, Wegmans, Walgreens, etc.) can and do pass along Pepsi's overcharges to consumers. An example of this is as follows:

| RETAILER | PEPSI (DIET PEPSI) DOZEN - 12 OZ | GATORADE (BLUE GATORADE) EIGHT BOTTLES - 12 OZ | STARBUCKS (FRAPPUCCINO BOTTLED) ONE BOTTLE – 13.7 OZ | ROCKSTAR ENERGY ONE CAN – 16 OZ |
|---|---|---|---|---|
| *Walmart* | $8.27 | $6.97 | $3.28 | $1.88 |
| *Target* | $8.39 | $7.99 | $3.49 | $1.89 |
| *Wegmans* | $8.99 | $7.99 | $3.89 | n/a |
| *Walgreens* | $11.49 | $8.99 | $4.19 | $2.49 |

54.     Consumers were harmed in the form of reduced-price competition, higher prices in the Relevant Market for Pepsi's soft drink products, reduced choice, throttled incentives for innovation, and stagnated product offerings.

55.     This is due, in part, because (i) direct purchasers are being sold products at inflated prices at retail due to Pepsi and Walmart's collective pricing decisions and and (ii) the agreement between Pepsi and Walmart does not allow Pepsi to sell Pepsi's soft drink products at other retailers for cheaper prices, which has the effect of fixing the entire market for Pepsi's products. And, because Pepsi represents a significant share of the Relevant Market consumers do not have a choice but to pay supracompetitive or inflated prices for products in the Relevant Market. Pepsi's reaping of supracompetitive profits and insulated market share allow it to continue to raise prices on consumers. Further, the policing of other retailers who do not price in lockstep with Walmart hurts consumers who do not purchase directly from Walmart, like Plaintiffs and the putative Class members, who are forced to pay at least as much as the prices that Walmart charges.

15

56.     Defendants' conspiracy increased and insulated Pepsi's market power by reducing competition, augmenting competitors' incentives to participate in non-Walmart price increases and reducing the risk that Pepsi would lose market share if it inflated its prices above competitive levels.

57.     The conspiracy also reduced competition on the retail level by impairing retailers from gaining market share by offering retail prices for Pepsi's soft drink products than Walmart's. As a result, the conspiracy increased Walmart's market power and caused consumers, like Plaintiffs and the putative Class members, to pay supracompetitive prices at retail at any other location other than Walmart.

### *Statutes of Limitation Do Not Bar Plaintiffs' Claims*

58.     During the conspiracy, Defendants' conduct entailed a continuing violation in which Defendants repeatedly invaded Plaintiffs' and Class members' interests by taking overt acts in furtherance of the conspiracy.

59.     Throughout the conspiracy, Defendants discussed the conspiracy, adjusted it to match new Walmart prices, agreed to new wholesale price increases, and repeatedly enforced their agreement against retailers who attempted to undercut Walmart's retail prices for Pepsi's soft drink products.

60.     Throughout the conspiracy, Defendants' repeatedly injured and Class members by causing them to pay overcharges each time they purchased Pepsi soft drink products at retail at sellers other than Walmart.

61.     The statute of limitations is tolled because Defendants fraudulently concealed their conspiracy.

62.    Plaintiffs and the Class members did not have actual or constructive knowledge of the facts constituting their claim for relief and did not discover, and could not have discovered, through the exercise of reasonable diligence, the existence of the conspiracy.

## V.    CLASS ALLEGATIONS

63.    Plaintiffs seek to bring this action as a Class Action pursuant to F.R.C.P. Rule 23 and seek certification of the following Classes (collectively referred to herein as the "Class"):

**Nationwide Class.**  All persons and entities throughout the United States who purchased Pepsi soft drink products at retail from any retailer other than Walmart from January 1, 2015 until the anticompetitive effects of the Defendants' challenged conduct ceases.

**California State Subclass**.  All persons and entities throughout the State of California who purchased Pepsi soft drink products at retail from any retailer other than Walmart from January 1, 2015 until the anticompetitive effects of the Defendants' challenged conduct ceases.

**Florida State Subclass.**  All persons and entities throughout the State of Florida who purchased Pepsi soft drink products at retail from any retailer other than Walmart from January 1, 2015 until the anticompetitive effects of the Defendants' challenged conduct ceases.

**Massachusetts State Subclass**.   All persons and entities throughout the Commonwealth of Massachusetts who purchased Pepsi soft drink products at retail from any retailer other than Walmart from January 1, 2015 until the anticompetitive effects of the Defendants' challenged conduct ceases.

**New York State Subclass.** All persons and entities throughout the State of New York who purchased Pepsi soft drink products at retail from any retailer other than Walmart from January 1, 2019 until the anticompetitive effects of the Defendants' challenged conduct ceases.

64.    Excluded from the Classes are Defendants, their officers and directors, and members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which Defendants have or had a controlling interest.  Also excluded is the judge presiding over this matter, the judge's staff members, and the judge's and the judge's staff members' immediate families and their legal representatives, heirs, successors, or assigns.

65. **Numerosity.** The members of the Class are so numerous that joinder of all members is impracticable. After a reasonable opportunity for further investigation or discovery, the evidence is likely to show that the Class members number in the millions.

66. **Typicality.** The claims of each Plaintiffs are typical of the claims of members of the Class, entities and persons that are similarly affected by Defendants' wrongful conduct in violation of the laws complained of herein. Plaintiffs purchased soft drink products indirectly from Pepsi during the Relevant Time Period and was injured thereby. Plaintiffs' injuries are typical of injuries of the members of the Class, all of whom also purchased Pepsi soft drink products indirectly from Pepsi during the Relevant Time Period.

67. The interests of Plaintiffs do not conflict with those of other members of the Class.

68. **Commonality.** Questions of law and fact common to the members of the proposed Classes include:

    a.  Whether the Defendants agreed to the conspiracy;

    b.  The nature, scope and extent of the conspiracy;

    c.  Whether retail competition for the sales of Pepsi soft drink products were impaired by the conspiracy;

    d.  Whether the conspiracy violates the Sherman Act and/or the state antitrust laws;

    e.  Whether the conspiracy is *per se* illegal under the Sherman Act or the state antitrust laws;

    f.  Whether, alternatively, the conspiracy is unlawful under the rule of reason;

    g.  Whether Plaintiffs and the other Class members were harmed by the conspiracy;

    h.  The appropriate measure of class-wide damages; and

i.    Whether the Court should grant injunctive and equitable relief to remedy and prevent the continuing harm caused by Defendants, and, if so, to what extent.

69.    **Predominance.**    The above issues predominate over all issues affecting only individual Class members.

70.    **Superiority.**    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members of the Classes is impracticable.    Furthermore, as the damages suffered by some of the individual Class members is relatively small, the expense and burden of individual litigation makes it impractical for members of the Classes to redress the wrongs done to them.    Litigating hundreds of individual cases also would inevitably lead to inconsistent rulings and results, unnecessarily burden the judicial and legal system, and magnify the delay and expense to all the parties.

<u>COUNT I</u>

**VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT**

**VERTICAL PRICE FIXING**

**(NATIONWIDE CLASS)**

71.    Plaintiffs incorporate and reallege, as though fully set forth herein, each of the paragraphs set forth above.

72.    Beginning at least as early as when the Class Period started, Defendants entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially fix, raise, and stabilize the prices for soft drink products in the United States, in violation of Section 1 of the Sherman Act (15 U.S.C. Sect. 1).

73.    In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants agreed, combined and conspired to fix, raise, or stabilize the price of Pepsi's soft drink products.

74.    The combination and conspiracy alleged herein has had the following effects, among others:

   a.    Price competition in the sale of soft drink products has been restrained, suppressed, and/or eliminated in the United States;

   b.    Price competition was throttled between Defendants themselves as they both sell soft drink products;

   c.    Prices for soft drink products sold by the Defendants have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

   d.    Those who purchased soft drink products indirectly from Defendants and their co-conspirators for their personal use have been deprived of the benefits of free and open competition.

75.    Plaintiffs and members of the Class have been injured and will continue to be injured financially by paying more for soft drink products purchased indirectly from Pepsi soft drink products for their personal use than they would have paid and will pay in the absence of the combination and conspiracy.

76.    Plaintiffs and members of the Class are entitled to declaratory relief as well as an injunction against the Defendants, preventing and restraining the violations alleged herein.

## COUNT II

## VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT

## EXCHANGE OF COMPETITIVELY SENSITIVE INFORMATION

## (NATIONWIDE CLASS)

77.    Plaintiffs incorporate and reallege, as though fully set forth herein, each of the paragraphs set forth above.

78.    Beginning at a time currently unknown to Plaintiffs, but as late as January 1, 2015, and continuing through the present day, Defendants and their co-conspirators entered into continuing agreement to regularly exchange detailed, timely, competitively sensitive information which is non-public and is about their operations.  This agreement is an unreasonable restraint of trade under the Sherman Act.

79.    The information regularly exchanged by Defendants pursuant to the agreement has consists of information about supply, output, production and pricing of soft drink products. Defendants' regular information exchanges through data tracking sources reflected an independent concerted action between horizontal competitors in the Relevant Market.

80.    The agreement to regularly exchange this information through data sharing mechanisms about production, supply and price suppressed competition between the Defendants.

81.    Accordingly, Defendants used the data obtained through by Pepsi to reduce the uncertainty that they would have individually faced from not knowing what their competitors were offering and providing in terms of price in the market for Pepsi and soft drink products.  This strategic information was a material factor in the decisions to inflate prices that Plaintiffs paid during the Class Period.

82.     Defendants' unlawful agreements to exchange, and the actual decision to exchange, this data was not reasonably necessary to further any procompetitive purpose.  The information exchange has had the effect of (1) reducing and suppressing competition among Defendants in the market for soft drink products and (2) inflating the price of soft drink prices during the Class Period.  As a result of this conduct, Plaintiffs and Class members have been injured in their business or property by paying artificially inflated prices for soft drink products during the Class Period.

### COUNT III

**VIOLATION OF STATE ANTITRUST STAUTES**

**CALIFORNIA CARTWRIGHT ACT – CAL. BUS. & PROF. CODE § 16700**

**(CALIFORNIA STATE SUB-CLASS)**

83.     Plaintiffs incorporate and reallege, as though fully set forth herein, each of the paragraphs set forth above.

84.     California's Cal. Bus. & Prof. Code § 16700 prohibits contracts, combinations, conspiracies, or agreements in restraint of trade, with the policy of encouraging competition or the free exercise of any activity in the conduct of any business, trade or commerce in California. Cal. Bus. & Prof. Code § 16700.

85.     Plaintiff Govea purchased soft drink products within the State of California during the Class Period indirectly from Pepsi.  But for Defendants' conduct set forth herein, the price of soft drink products sold by Pepsi would have been lower, in an amount to be determined at trial.

86.     Under California law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint.  Defendants restrained competition in the free exercise of the conduct of the business of soft drink products within the intrastate commerce of California.

87.     There is no legitimate, non-pretextual procompetitive business justification for Defendants' conspiracy that outweighs its harmful effects.  Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such a purpose.

88.     The aforesaid contract, combination and conspiracy between and among the Defendants and their co-conspirators was furthered and effectuated by the acts as discussed both above and below.

89.     The conspiracy had the intended effect, as Defendants benefited from their restraints of trade on soft drink products and the elimination of competition, which both artificially inflated the prices of Pepsi soft drink products for consumers who purchased said soft drink products indirectly.

90.     As a result of Defendants' unlawful conduct, Plaintiff Govea and the other members of the Class have been injured in their business and property in that they have now paid more for Pepsi soft drink products than they otherwise would have paid in the absence of Defendants' unlawful conduct. Plaintiff Govea and members of the California Sub-Class were injured with respect to purchases of soft drink products and are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' fees.

<u>**COUNT IV**</u>

**VIOLATION OF STATE ANTITRUST STAUTES**

**NEW YORK'S DONNELLY ANTITRUST ACT – N.Y. GEN. BUS. LAW 340**

**(NEW YORK STATE SUB-CLASS)**

91.    Plaintiffs incorporate and reallege, as though fully set forth herein, each of the paragraphs set forth above.

92.    New York's Article 22 of the New York General Business Law general prohibits monopolies and contracts or agreements in restraint of trade, with the policy of encouraging competition or the free exercise of any activity in the conduct of any business, trade or commerce in New York. N.Y. Gen. Bus. Law § 340(1).

93.    Plaintiff Hinds and Govea purchased soft drink products within the State of New York during the Class Period indirectly from Pepsi.  But for Defendants' conduct set forth herein, the price of soft drink products sold by Pepsi would have been lower, in an amount to be determined at trial.

94.    Under New York law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint.  N.Y. Gen. Bus. Law § 340(6).

95.    Defendants restrained competition in the free exercise of the conduct of the business of soft drink products within the intrastate commerce of New York, in violation of N.Y. Gen. Bus. Law § 340, *et seq.*

96.    There is no legitimate, non-pretextual procompetitive business justification for Defendants' conspiracy that outweighs its harmful effects.  Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such a purpose.

97.    The aforesaid contract, combination and conspiracy between and among the Defendants and their co-conspirators was furthered and effectuated by the acts as discussed both above and below.

98.    The conspiracy had the intended effect, as Defendants benefited from their restraints of trade on soft drink products and the elimination of competition, which both artificially inflated the prices of Pepsi soft drink products for consumers who purchased said soft drink products indirectly.

99.    As a result of Defendants' unlawful conduct, Plaintiffs Hinds and Govea and the other members of the Class have been injured in their business and property in that they have now paid more for Pepsi soft drink products than they otherwise would have paid in the absence of Defendants' unlawful conduct. Plaintiffs and members of the New York Sub-Class were injured with respect to purchases of soft drink products in New York and are entitled to all forms of relief, including actual damages, treble damages, costs not exceeding $10,000, and reasonable attorneys' fees.

## COUNT V

### VIOLATON OF STATE ANTITRUST STAUTES

### MASSACHUSETTS' M.G.L. CHAPTER 93A

### (MASSACHUSETTS COMMONWEALTH SUB-CLASS)

100.    Plaintiffs incorporate and reallege, as though fully set forth herein, each of the paragraphs set forth above.

101.    Massachusetts' Massachusetts M.G.L. Chapter 93(a) general prohibits monopolies and contracts or agreements in restraint of trade, with the policy of encouraging competition or the free exercise of any activity in the conduct of any business, trade or commerce in Massachusetts.

102.    Plaintiff Hinds purchased soft drink products within the Commonwealth of Massachusetts during the Class Period indirectly from Pepsi.  But for Defendants' conduct set forth herein, the price of soft drink products sold by Pepsi would have been lower, in an amount to be determined at trial.

103.    Under Massachusetts law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint.

104.    Defendants restrained competition in the free exercise of the conduct of the business of soft drink products within the intrastate commerce of Massachusetts.

105.    There is no legitimate, non-pretextual procompetitive business justification for Defendants' conspiracy that outweighs its harmful effects.  Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such a purpose.

106.    The aforesaid contract, combination and conspiracy between and among the Defendants and their co-conspirators was furthered and effectuated by the acts as discussed both above and below.

107.    The conspiracy had the intended effect, as Defendants benefited from their restraints of trade on soft drink products and the elimination of competition, which both artificially inflated the prices of Pepsi soft drink products for consumers who purchased said soft drink products indirectly.

108.    As a result of Defendants' unlawful conduct, Plaintiff Hinds and the other members of the Class have been injured in their business and property in that they have now paid more for Pepsi soft drink products than they otherwise would have paid in the absence of Defendants' unlawful conduct. Plaintiffs and members of the Massachusetts Sub-Class were injured with

respect to purchases of soft drink products in Massachusetts and are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' fees.

**COUNT VI**

**VIOLATION OF STATE ANTITRUST STAUTES**

**FLORIDA'S UNFAIR AND DECEPTIVE TRADE PRACTICES ACT**

**(FLORIDA STATE SUB-CLASS)**

109.    Plaintiffs incorporate and reallege, as though fully set forth herein, each of the paragraphs set forth above.

110.    Florida's FDUPTA statute general prohibits monopolies and contracts or agreements in restraint of trade, with the policy of encouraging competition or the free exercise of any activity in the conduct of any business, trade or commerce in Massachusetts.

111.    Plaintiff Hinds purchased soft drink products within the State of Florida during the Class Period indirectly from Pepsi.  But for Defendants' conduct set forth herein, the price of soft drink products sold by Pepsi would have been lower, in an amount to be determined at trial.

112.    Under Florida law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint.

113.    Defendants restrained competition in the free exercise of the conduct of the business of soft drink products within the intrastate commerce of Florida.

114.    There is no legitimate, non-pretextual procompetitive business justification for Defendants' conspiracy that outweighs its harmful effects.  Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such a purpose.

115.    The aforesaid contract, combination and conspiracy between and among the Defendants and their co-conspirators was furthered and effectuated by the acts as discussed both above and below.

116.    The conspiracy had the intended effect, as Defendants benefited from their restraints of trade on soft drink products and the elimination of competition, which both artificially inflated the prices of Pepsi soft drink products for consumers who purchased said soft drink products indirectly.

117.    As a result of Defendants' unlawful conduct, Plaintiff Hinds and the other members of the Class have been injured in their business and property in that they have now paid more for Pepsi soft drink products than they otherwise would have paid in the absence of Defendants' unlawful conduct. Plaintiffs and members of the Florida Sub-Class were injured with respect to purchases of soft drink products in Florida and are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' fees.

**VI.    REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs and Class members request the following relief:

a.    Certification of the action as a Class Action pursuant to F.R.C.P. Rule 23, and appointment of Plaintiffs as Class Representatives and their counsel of record as Class Counsel;

b.    The conduct alleged be adjudged and decreed to be unlawful restraints of trade in violation of the Sherman Antitrust Act and of the state antitrust laws;

c.    A judgment for the damages sustained by Plaintiffs and the Class defined herein, and for any additional damages, equitable relief, penalties, and other monetary relief provided by applicable law, including trebled or statutory damages;

d.  Awarding Plaintiffs and Class Members pre-judgment and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the service of the initial complaint in this action;

e.  Awarding Plaintiffs and the costs of this suit, including reasonable attorneys' fees;

f.  Such injunctive relief as appropriate to remedy the significant threat of continuing injury posed by Defendants' violations of the antitrust laws; and

g.  Such other and further relief as the Court deems just and proper.

## VII.    JURY TRIAL DEMAND

118.  Plaintiffs on behalf of themselves and all others similarly situated hereby requests a jury trial on any and all claims so triable.

*[The Remainder of this Page is Intentionally Blank]*

**DATED**:          December 15, 2025          Respectfully Submitted,

/s/ *Blake Hunter Yagman*
Blake Hunter Yagman
*byagman@sshhzlaw.com*
**SCHONBRUN SEPLOW HARRIS**
**HOFFMAN & ZELDES, LLP**
1330 Ave. of the Americas, Suite 23A
New York, New York 10019
Telephone:  929-709-1493

*Attorneys for Plaintiffs and the Proposed Class*